## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S.M., by and through his parents, | : | |
| Michael C. and Danielle C., | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | No. 21-4266 |
| v. | : | |
| | : | |
| CHICHESTER SCHOOL | : | |
| DISTRICT, | : | |
| Defendant. | : | |

**October 7, 2024**                                                        **Anita B. Brody, J.**

### <u>MEMORANDUM</u>

Over three years have passed since S.M.—a now-seventeen-year-old boy with severe autism and intellectual disabilities—and his parents brought this action against Chichester School District ("Chichester"). Over two years have passed since I held that his parents are likely to establish that S.M. is entitled to a residential educational placement when this matter is adjudicated on the merits and, in the meantime, will suffer irreparable harm without one. Mem. 6-7, ECF No. 21. Although Chichester has referred S.M. to fifteen different residential educational placements and S.M. has been accepted to four, the parties have yet to agree on any of them. With each day of delay, S.M. continues to be harmed and gets one step closer to aging out of his entitlement to a free appropriate public education. I have therefore ordered Chichester to secure and fund S.M.'s residential educational placement at the Melmark School. Order, ECF No. 154.

1

## I.    BACKGROUND

S.M. is a seventeen-year-old boy whose autism and intellectual disabilities make it impossible for him to learn in a regular classroom.  Decl. of Danielle Ciavarelli ¶¶ 3-5.  He requires assistance to dress himself, shower, use the bathroom, and keep himself safe.  *Id*. ¶ 4; Dep. of Kristen Lefevre 49, ECF No. 9-11.  S.M.'s parents cannot provide for his needs by themselves, and when S.M. has lived at home, he has been hospitalized multiple times because of concerns for his safety and the safety of his family.  Dep. of Danielle Ciavarelli 655-58, ECF No. 9-7.  In the past, S.M. has made progress only while being educated in a residential facility.  *Id*. at 659-61.

In August 2020, S.M.'s parents moved to Chichester School District and requested that Chichester provide S.M. with an individualized educational program ("IEP") that included a residential educational placement.  Decl. of Danielle Ciavarelli ¶ 8-9.  Instead, Chichester issued an IEP that provided S.M. only with a day program.  *Id*. ¶ 10; Dep. of Danielle Ciavarelli 681, ECF No. 9-7.  Accordingly, since September 2021, S.M. has (1) lived in a medical residential treatment facility ("RTF")[1] at Elwyn; and (2) attended school

---

[1] The terms "RTF" and "residential educational placement" are not interchangeable.  *See* Hearing Officer Decision 19, ECF No. 9-3.  An RTF is a medical placement "prescribed by non-educational personnel for non-educational purposes" and is funded either by a child's parents or social services agencies.  *Id.*  By contrast, a residential educational placement one of the "continuum of alternative placements" a school district must offer qualifying students under the IDEA.  34 C.F.R. § 300.115. Residential educational placements can include "hospitals or institutions."  20 U.S.C. § 1401(16). However, when a student requires such a placement, a school district is only obliged to pay for the costs associated with "non-medical care and room and board" that are "necessary to provide special education and related services."  34 C.F.R. § 300.104; *see also Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 693 (3d Cir. 1981) (holding school district is responsible for "residential placement that is a necessary predicate for learning" but not "the provision of services that are unrelated to learning skills.").

at the Delaware County Intermediate Unit.  Decl. of Danielle Ciavarelli ¶¶ 25, 28, 32, 34,

35.  S.M.'s medical and educational programming are not coordinated; as a result, he has

struggled to develop basic life skills.  *Id.* ¶¶ 29-30.  Although S.M.'s parents could remove

him from Elwyn's RTF at any time, they have not done so because without a residential

educational placement, "this would only throw him back into a crisis situation."  *Id.* ¶ 31.

## II.  PROCEDURAL HISTORY

In September 2021, S.M.'s parents sued Chichester, alleging that Chichester had

violated the Individuals with Disabilities Education Act and Section 504 of the

Rehabilitation Act by failing to provide S.M. a free appropriate public education.  Compl.,

ECF No. 1.  In February 2022, S.M.'s parents moved for a preliminary injunction requiring

Chichester to secure a residential educational placement for S.M.  Pls.' Mot. for Prelim.

Inj., ECF No. 10.  Chichester opposed the motion, arguing that S.M. did not need a

residential educational placement to receive a free appropriate public education. Def.'s

Resp., ECF No. 18.  In March 2022, I granted S.M.'s motion and ordered Chichester:

> to make all necessary referrals for residential educational
> placement for purposes of S.M.'s [free appropriate public
> education], in full consultation with parents; make all necessary
> arrangements to secure such placement and authorize the
> necessary funding; and plan for and execute a reasonable and
> appropriate plan for transitioning S.M. from the [residential
> treatment facility] where he currently resides, to the residential
> educational placement the parties mutually select, as soon as
> practicably possible.

Order, ECF No. 22; *see also* Mem. Regarding Mot. for Prelim. Inj., ECF No. 21.  In April

2022, Chichester appealed and moved for a stay pending appeal.  *See* Notice of Appeal,

ECF No. 24; Mot. for Recons. or Stay, ECF No. 23.[2]  In June 2022, I denied Chichester's

motion.  *S.M. by & through Michael C. v. Chichester Sch. Dist.*, 2022 WL 2134165, at *2-

3 (E.D. Pa. June 14, 2022).

In June 2022, Chichester sent a referral to the Shorehaven School in Elkton,

Maryland, a nearby school that S.M.'s parents believed could meet S.M.'s needs.  Def.'s

Resp. to Mot. for Contempt Ex. C, at 2, ECF No. 37-3 (Chichester's referral to

Shorehaven); Ex. B, at 1, ECF No. 37-2 (email noting Shorehaven was "only 40 minutes

away" from S.M.'s parents and "appear[ed] to be a high quality program.").  In September

2022, Shorehaven offered S.M. a residential educational placement.  Pls.' Resp. to Mot. to

Dissolve the Prelim. Inj. Ex. A, at 2, ECF No. 46-1 (Shorehaven acceptance letter).  On

December 2, 2022—after Chichester refused to fund the placement because it was out-of-

state—Shorehaven withdrew its offer.  Pls.' Resp. to Mot. to Dissolve the Prelim. Inj. 4,

ECF 46; *see also* Ex. A, at 3, ECF No. 46-1 (email from Shorehaven's Deputy Director of

Programs withdrawing offer).

In late December 2022, S.M. was accepted to the Elwyn Children's Residential

Treatment and Learning Center, in Elwyn, Pennsylvania.  Def.'s Mot. to Dissolve Prelim.

Inj. 2, Ex. A, ECF No. 43.  Chichester notified S.M.'s parents of the acceptance in early

---

[2] In September 2024, the Court of Appeals for the Third Circuit affirmed the March 2022 order
issuing the preliminary injunction.  *See S.M. by & through Michael C. v. Chichester Sch. Dist.*,
No. 22-1612, 2024 WL 4262788 (3d Cir. Sept. 23, 2024).

4

January 2023 and issued a Notice of Recommended Educational Placement ("NOREP")[3] at Elwyn in March 2023. *See id.* After touring the proposed placement, S.M.'s parents objected to it on the ground that it was no different from Elwyn's RTF "where he h[ad] been languishing." Pls.' Resp. to Mot. to Dissolve the Prelim. Inj. 2, ECF No. 46; *see also* Ex. C, at 7, ECF No. 46-3 (formal objection to NOREP).[4] Notwithstanding S.M.'s parents' objection, Elwyn's offer remained open.[5]

In May 2023, Shorehaven indicated that it may be able to extend S.M. another offer. Pls.' Emergency Mot. to Enforce Prelim. Inj. Ex. A, at 1, ECF No. 49-2. In early August 2023, S.M.'s parents moved to enforce the preliminary injunction, requesting that Chichester be ordered to send an updated referral to Shorehaven. Pls.' Emergency Mot. to Enforce Prelim. Inj., ECF No. 49. Chichester opposed the motion. Chichester was "skeptical as to how all services [at Shorehaven could] be educational"—even though Shorehaven indicated they were—given that Shorehaven "only has educational

---

[3] The Individuals with Disabilities Education Act ("IDEA") requires that parents of a student with disabilities receive prior written notice before a school "proposes to initiate or change" the student's educational placement. 20 U.S.C. § 1415(b)(3)(A). In Pennsylvania, the form used to provide this notice is called a NOREP. *T.R. v. Sch. Dist. of Philadelphia*, 223 F. Supp. 3d 321, 325 (E.D. Pa. 2016).

[4] The record shows that S.M.'s mother filed two complaints regarding the quality of care, programming, and staffing at Elwyn's RTF: one in April 2022, and another in April 2023. *See* Pls.' Resp. to Mot. to Dissolve the Prelim. Inj. Ex. B, at 2, ECF No. 46-2 (April 2022 complaint, explaining how S.M. returned home with a "broken skin and bruising" on his shoulder after another child bit him—an incident that Elwyn's staff knew had happened but never reported to S.M.'s parents); *id.* at 5 (April 2023 complaint, detailing how S.M.'s mother came to pick him up at 1:00 pm and found him asleep and soaked in urine).

[5] Chichester issued the same NOREP in March 2024, to which S.M.'s parents objected on the same grounds. Pls.' Letter, Appx. Attachment A, at 1-5, ECF No. 152-2 (March 2024 NOREP); *id.* at 6 (objecting because "[t]his is the same RTF placement where [S.M.] has been residing since September, 2021").

programming for 220 days per year," and Chichester therefore disagreed to fund S.M.'s placement. Def.'s Resp. to Emergency Mot. 3, ECF No. 53. Shortly thereafter, Shorehaven retracted its potential offer, so I denied the motion as moot. Order, ECF No. 55.

As of August 2023, progress toward securing S.M.'s residential educational placement had stalled. The parties thus agreed to refer the case to an educational consultant who could find and pursue additional placement options. They mutually selected Mindy Goodman. Order, ECF No. 55; *see also* Joint Status Rep., ECF No. 65 (reporting that Goodman was "approved by the Chichester School District Board of Directors to complete an evaluation of [S.M.'s] placement needs[.]").

In November 2023, S.M. received an offer from the Shrub Oak International School in Mohegan, New York, which Goodman approved. *See* Nov. 15, 2024 Conference Tr. 2:12-17, ECF No. 96; Jan. 24, 2024 Conference Tr. 4:6-8, ECF No. 97. On January 26, 2024, I ordered Chichester to facilitate S.M.'s placement at Shrub Oak. Order, ECF No. 76. One week later, Chichester moved for reconsideration of that order and to remand the case to the Pennsylvania Office for Dispute Resolution, arguing that "critical new information" had come to light suggesting that S.M. no longer needed a residential educational placement. Def.'s Mot. for Recons. 4, ECF No. 88. S.M.'s parents opposed Chichester's motion. Pls.' Resp. to Mot. for Recons., ECF No. 89. After conferencing with the parties, I vacated the Shrub Oak order and appointed Dr. Mary Lazar to conduct an independent, updated evaluation of S.M. *See* Order, ECF No. 91 (placing Shrub Oak order in suspense); Feb. 20, 2024 Conference Tr. 4:1-8:9, ECF No. 119 (outlining efforts

6

to identify and appoint an appropriate psychologist); Order, ECF No. 112 (appointing Dr. Lazar); Order, ECF No. 117 (granting Chichester's motion for reconsideration, denying its motion for remand, and vacating the Shrub Oak order).

On July 17, 2024, Dr. Lazar filed her report, and I ordered the parties to meet and confer and submit a joint update in advance of a status conference set for August 20, 2024. *See* Report, ECF No. 132; Order, ECF No. 133. Meanwhile, on August 7, 2024, S.M. was offered a residential educational placement at Melmark, located in Berwyn, Pennsylvania. *See* Letter, ECF No. 138.[6] After learning of the offer, Chichester asked me to stay the status conference until after the Court of Appeals for the Third Circuit heard argument on their appeal of the March 2022 preliminary injunction order. Def.'s Letter, ECF No. 139. Because Melmark's offer was set to expire on August 28, 2024, I declined to do so. *See* Pls.' Letter 2, ECF No. 140 (noting deadline for Melmark offer); *but see* Order, ECF No. 154 (deferring further action until after September 4, 2024 argument).

On August 20 and 21, 2024, I held hearings to discuss Dr. Lazar's report and— hopefully, finally—facilitate S.M.'s residential educational placement at Elwyn or

---

[6] Pennsylvania maintains a list of "approved private schools" that provide "specific special education program[s]" approved by the Secretary of the Department of Education and are "thereby eligible to receive payments for tuition, or tuition and maintenance, from funds of the school district or the Commonwealth, or both." 22 Pa. Code. § 171.11. The Melmark School's "7-day residential" program and Elwyn Davidson's day school program are both included on the most recent list. *See* COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION, *Directory of Approved Private Schools & Chartered Schools for the Deaf and the Blind* 26-27 (May 2024) [hereinafter "APS Directory"], https://www.education.pa.gov/Documents/K-12/Special%20Education/APS%20Directory.pdf (Melmark); *id.* at 9 (Elwyn). Goodman did not recommend either program, but only because they not have any openings at the time she was researching and compiling her recommendations. *See* Aug. 21, 2024 Hr'g Tr. 65:17-66:8, ECF No. 149 (Goodman testifying to the same).

Melmark.  The parties presented testimony from S.M.'s mother, Dr. Lazar, Goodman, and representatives from both programs.  Aug. 20, 2024 Hr'g Tr., ECF No. 148; Aug. 21, 2024 Hr'g Tr., ECF No. 149.  The parties then informally briefed their respective positions.  Def.'s Status Report, ECF No. 151; Pls.' Letter, ECF No. 152.

## III.   DISCUSSION

The Individuals with Disabilities Education Act ("IDEA") "offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citing 20 U.S.C. § 1400 *et seq.*).[7] In exchange for those funds, States pledge to provide every qualifying child a "free appropriate public education"[8]  through a uniquely tailored "individualized education program" ("IEP").  20 U.S.C. §§ 1401(9), 1412(a)(1). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399. An IEP need not be "ideal," *id.*, or "incorporate every program requested by the child's parents," *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012), to be satisfactory. Rather, an IEP must be "likely to produce progress, not regression or trivial educational

---

[7] Pennsylvania receives these funds and thus is subject to the IDEA's requirements.  It has also adopted related federal regulations by incorporation by reference.  22 Pa. Code § 14.102(a)(1)-(2).

[8] A "free appropriate public education" includes both "special education" and "related services." 20 U.S.C. §§ 1401(9) (defining "free appropriate public education"), (26)(A) ("related services"), (29) ("special education").  "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." *Id.* § 1401(29)(A); 34 C.F.R. § 300.39(a)(1)(i).  "Related services" are the support services "required to assist a child . . . to benefit from" that instruction.  20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34(a).

advancement." *K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *Ridley*, 680 F.3d at 269); *see also T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) ("[A] satisfactory IEP must provide 'significant learning' and confer 'meaningful benefit.'") (internal citation omitted).

### A.   S.M. still requires a residential educational placement.

Chichester maintains, as it has since day one, that S.M. does not need a residential educational placement to receive a free appropriate public education. *See* Def.'s Status Report 3, ECF No. 151. S.M.'s parents and Dr. Lazar disagree. Pls.' Letter 2, ECF No. 152 ("S.M. requires a residential educational placement."); Report 3, ECF No. 132 (concluding "[S.M.'s] needs would most appropriately be met by a residential educational placement specialized for students with developmental disabilities, including autism and intellectual disability.").[9] So too do I.

The record suggests that S.M.'s behavior may have improved since I issued the injunction in March 2022. *See* Report 2, ECF No. 132 ("[D]ata and anecdotal report[s] from both his school and residential placements consistently pointed to a pattern of reduced frequency of concerning behaviors (e.g., disruption, noncompliance, and sexualized behavior)"); *but see* Aug. 20, 2024 Hr'g Tr. 41:8-43:20 (S.M.'s mother explaining how his problematic behaviors "spike" when he comes home for longer than a night). Nonetheless, the record also makes clear that S.M. still struggles with "basic self-help and social skills"

---

[9] In affirming the March 2022 order granting a preliminary injunction, the Court of Appeals for the Third Circuit also concluded that "the record support[s] a finding that placement at a residential educational facility is necessary for S.M. to receive a [free appropriate public education]." *S.M. by & through Michael C.*, 2024 WL 4262788, at *1.

such as toileting, showering, brushing his teeth, dressing, feeding himself, and communicating. *Kruelle*, 642 F.2d at 693 ("[T]he concept of education is necessarily broad. . . Where basic self-help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point."); Report 30-33, ECF No. 132 (S.M.'s test results). S.M. can only develop these skills in a program that provides "uniformity and consistency across school and residential settings." Report 3, ECF No. 132. For these reasons, I find that S.M.—who only has four years left to learn how to function in everyday life—requires a residential educational placement now more than ever. *See, e.g., id.* at 2 ("Given that [S.M.] has four years remaining in school, it is absolutely essential to capitalize on his improved behavior and availability for an even higher level of intensive programming to meet areas of need in communication, adaptive skills, behavior, and transition planning."); Aug. 20, 2024 Hr'g Tr. 86:12-87:10 (Dr. Lazar testifying to the same).

**B.    Chichester's proposed placement at Elwyn does not satisfy its substantive obligations under the IDEA.**

Assuming S.M. does require such a placement, Chichester contends that the Elwyn residential educational placement—under which S.M. would attend school at Elwyn's Davidson School and live at Elwyn's Residential Center—will provide a free appropriate public education. *See* Def.'s Status Rep. 12-19, ECF No. 151. S.M.'s parents disagree. They argue that Elwyn's Residential Center "is the same" as the Elwyn residential treatment facility where S.M. has languished for the past three years; accordingly, Elwyn cannot provide a free appropriate public education no matter what services S.M. may

receive during the day at Elwyn Davidson.  Pls.' Letter 3, ECF No. 152.

Based on the record, it is unclear whether Elwyn's Residential Center and its residential treatment facility are, in fact, different.[10]  Chichester has explained that its proposed residential educational placement would involve "transitioning S.M. from the RTF in which he reside[s] to a different bed in the same facility but pursuant to a different program."  Def.'s Mot. to Dissolve the Prelim. Inj. 4, ECF No. 43; *see also* Def.'s Status Rep. 3, ECF No. 151 ("[T]he District has identified the Elwyn residential educational 24/7 IEP placement (**not** the current Elwyn residential treatment facility, a medical placement) as an offer of a free appropriate public education (FAPE) . . . .").

Even assuming Chichester's proposed residential educational placement is different from S.M.'s current medical placement, nothing in the record suggests that Chichester's proposed placement at Elwyn is reasonably calculated to enable S.M. to make appropriate

---

[10]  Elwyn's website explains that the Residential Center "provides intensive therapeutic intervention services to children and adolescents ages 6-21 with autism spectrum disorder, experiencing acute behavioral challenges, and exhibiting resistance to treatment." *Children's Behavioral Health Services: Services Tailored for Autism Spectrum Disorder—Addison Hines Children's Residential Treatment & Learning Center*, Elwyn, https://www.elwyn.org/services/children-s-behavioral-health-services (last visited Oct. 7, 2024); *see also* Def.'s Mot. to Dissolve Prelim. Inj. Ex. A, ECF No. 43 (acceptance letter from Crystal Iorizzo, the Director of Clinical Services at Elwyn's Residential Center, noting that S.M. "meets the inclusionary clinical requirements for acceptance" and describing the Center as a "treatment facility specifically designed to treat children/adolescents on the autism spectrum").  A prior version of Elwyn's website, excerpted in the administrative record, describes Elwyn's RTF using identical language.  *See* Administrative Record from the Office of Dispute Resolution Ex. 15, at 27, ECF No. 9-15.  Likewise, when discussing S.M.'s proposed residential educational placement at Elwyn, Joseph Flynn—the Assistant Principal of the High School Program at Elwyn Davidson—and Chichester's counsel focused on collaboration between Elwyn Davidson and the RTF and made no mention of the Residential Center.  *See* Aug. 21, 2024 Hr'g Tr. 81:19-85:14, ECF No. 149.

progress.  To the contrary: in the two NOREPs Chichester issued recommending S.M.'s placement at Elwyn, Chichester all but admitted that it procured the placement only to satisfy the March 2022 preliminary injunction—not because it believed that Elwyn could meet S.M.'s unique needs.  *See* Def.'s Mot. to Dissolve Prelim. Inj. 2, Ex. A, ECF No. 43 (March 2023 NOREP, explaining that Chichester was proposing a residential educational placement at Elwyn "[p]ursuant to a Court order dated March 24, 2022"); Pls.' Letter, Appx. Attachment A, ECF No. 152-2 (March 2024 NOREP, stating same); *Ridley*, 680 F.3d at 275 (A NOREP is "properly considered part of [a student's] overall educational plan.").

Chichester's lackluster justification notwithstanding, other evidence shows that Elwyn cannot provide the "special education" and "related services" S.M. requires under the law.  20 U.S.C. §§ 1401(26), (29).  For example, Joseph Flynn—the Assistant Principal of the High School Program at Elwyn Davidson—testified that S.M.'s math instruction would be "focus[ed] on vocational math, meaning that we want him to understand place value, so he has a thorough understanding of money."  Aug. 21, 2024 Hr'g Tr. 81:14-16, ECF No. 149.  As detailed in Dr. Lazar's report, S.M. currently receives the same type of math instruction at the Delaware County Intermediate Unit, and it is a "poor match" for someone who has the problem-solving and language skills of a toddler between the ages of 2 of 3.  Report 5, ECF No. 132; *see also id.* at 25 (S.M.'s personal care assistant explaining that S.M. "doesn't understand anything" in math class so "he mostly sits on a beanbag chair, and she does the math for him"), 26-27 (describing math class where S.M. struggled to distinguish coins and failed to complete a place value worksheet).  Giving

S.M. more of the same will at best produce "trivial educational advancement," and at worst, "regression"—neither of which are countenanced under the IDEA.  *K.D.*, 904 F.3d at 254 (internal citation omitted).  And though Flynn explained that "life skills" would "really [be] the focus" of S.M.'s programming at Elwyn's Residential Center, no one from Elwyn could testify as to what that would look like in practice.  *See* Aug. 21, 2024 Hr'g Tr. 84:22-85:14, ECF No. 149.   S.M.'s Residential Center admission letter says that the Center's "focus w[ould] be on giving both [S.M. and his parents] strategies for managing problem behavior," but as discussed above, S.M. requires more from the residential component of his placement.  Def.'s Mot. to Dissolve Prelim. Inj. Ex. A, ECF No. 43; *see also* Report 3-4, ECF No. 132  (explaining how S.M.'s current programming "is directed decreasing problematic behaviors" but should "apply broadly to all of [S.M.'s] needs, including language/communication skills, improving attention/engagement in activities, increasing independence in daily living skills, and supporting social functioning.").

For all these reasons, I find that Chichester's proposed residential educational placement at Elwyn is unlikely to produce progress for S.M. and does not satisfy Chichester's substantive obligation under the IDEA.

**C.**     **The record shows that Melmark will enable S.M. to make appropriate progress in light of his circumstances.**

Although Elwyn's residential educational programming will not enable S.M. to make appropriate progress, Melmark's will.

As noted above, S.M. needs "uniformity and consistency across school and residential settings" to make appropriate educational progress.  Report 3, ECF No. 132.

Krystina Shellmire, Melmark's Director of Children's Residential Homes, described Melmark's residential educational program as a "packaged program" where children work on the same academic and behavioral goals at the Melmark School and residential homes. Aug. 21, 2024 Hr'g Tr. 22:10, ECF No. 149; *see also id*. at 22:17-23:7, 22:2-15 (describing cross-collaboration between Melmark's school and residential settings).  She testified that in S.M.'s case, those goals would be geared toward improving self-care, communication, and daily living skills.  *See id*. at 28:3-5.[11]  Christiana Skinner-Walker, Melmark's Director of Educational Services, confirmed the same.  *Id*. at 40:9-12; 43:19-44:3.

Furthermore, Dr. Lazar's report specifically recommends that S.M.'s "profile of severe cognitive deficits and [] limited repertoire of skills warrants intensive Applied Behavior Analysis ("ABA")"—a type of programming for students with autism that Chichester agrees is "critical" for S.M.  Report 3, ECF No. 132; Def.'s Status Report 11, ECF No. 151 (stating that ABA "is a critical component of programming" for students like S.M.).  Flynn explained that Elwyn staff employ ABA to address "behaviors that take [] away from learning."  *See* Aug. 21, 2024 Hr'g Tr. 88:9-89:1, ECF No. 149; *see also id*. at

---

[11] Chichester asserts that S.M. was previously "enrolled in Melmark's residential program for two years[.]"  Def.'s Status Rep. 7, ECF No. 151.  This warrants clarification.  As Shellmire explained, S.M. "was in a different residential program" on Melmark's campus (Melmark's medical residential treatment facility) from 2019 to 2020.  Aug. 21, 2024 Hr'g Tr. 34:14-25, ECF No. 149. Nonetheless, the record shows that S.M. received consistent support—and as a result, made substantial progress—when he lived at Melmark's RTF.  *See* Dep. of Danielle Civarelli 659:19-22, ECF No. 9-7 ("Q: What are some of the things that he received at Melmark that he didn't receive before then that helped him? A:  He received consistent one-on-one care.  He received consistent staffing.  He received consistent schedules, consistent walking, consistent like life skills."); *id*. at 660-61 (describing S.M.'s improved toileting and behavior, and how S.M. learned how to ride a bike); *id*. at 701:15-702:6 (noting how S.M. "was starting to strive in certain things [like] never [] before" because of Melmark's "consistency" and "structure").

68:4-6 (Goodman testifying that ABA "is not ingrained in the same way [at Elwyn], and it's not consistent.").   By contrast, multiple witnesses testified that ABA is the hallmark of Melmark's programming, and is used not only to address problematic behaviors, but also to teach and reinforce skills related to self-care and independence.  *See id.* at 19:9-21:23, ECF No. 149 (Shellmire explaining how ABA is used at Melmark); *see also id.* 24:3-14 (additional Shellmire testimony); 51:18-52:7 (Skinner-Walker testimony); 67:12-17 (Goodman testimony).[12]

The record evidence speaks clearly and with one voice:  anything less uniform, consistent, and intensive than Melmark's residential educational program is unlikely to confer "a meaningful educational benefit" on S.M.  *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d at 577.  I arrive at this conclusion not because I find Melmark "ideal," or because S.M.'s parents prefer Melmark.  *Endrew F.*, 580 U.S. at 399; *see also Ridley*, 680 F.3d at 269.  Rather, I find that Melmark—but not Elwyn—will give S.M. the appropriate special education and related services he is long owed.

## IV.  CONCLUSION

For the above reasons, I have ordered Chichester to (1) take all necessary steps to secure S.M.'s residential educational placement at the Melmark School for his immediate admission—including signing an enrollment contract and completing all related

---

[12] Separately, the APS Directory explicitly notes that Melmark's residential educational programming is "based on Applied Behavior Analysis," but makes no mention of Elwyn's residential educational programming, let alone whether it incorporates Applied Behavioral Analysis.  *Compare* APS Directory 26 (Melmark) *with* APS Directory 9 (Elwyn); *see also* Fed. R. Evid. 201(b)(2) (allowing a court to take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

requirements—on or before September 5, 2024; and (2) make all necessary arrangements

to fund S.M.'s placement at the Melmark School.

                                _____s/ANITA B. BRODY , J._____
                                ANITA B. BRODY, J.